## 18-UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **FRANCIS M. VAN BUSKIRK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 18 C 8035** |
| | ) | |
| **ANDREW SAUL, Commissioner of** | ) | **Judge Rebecca R. Pallmeyer** |
| **Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### MEMORANDUM OPINION AND ORDER

Plaintiff Francis Van Buskirk applied for a period of disability and disability insurance benefits on January 11, 2015, alleging disability beginning on January 10, 2015. (Administrative Record[1] ("R.") at 16.) Van Buskirk claimed she was primarily suffering from back and leg pain, gastrointestinal issues, and mental health issues including depression and anxiety. (R. 21-26.) The Social Security Administration ("SSA") denied Van Buskirk's application on December 18, 2015. (R. 16.) On January 8, 2016, she requested a hearing, and on May 31, 2017, she appeared and testified before an administrative law judge ("ALJ"). (*Id.*) On December 26, 2017, the ALJ issued a decision denying Van Buskirk's claim for benefits. Relying on information from state agency consultants, the ALJ found Van Buskirk was not disabled between January 10, 2015, and the date of the ALJ's decision (the "insured period") because she had the residual functional capacity ("RFC") to perform light work as a cashier, rental clerk, or companion. (R. 27-28.) On October 9, 2018, the SSA Appeals Council denied Van Buskirk's request for review. (R. 1-4.) On December 6, 2018, Van Buskirk filed this lawsuit under 42 U.S.C. § 405(g) to challenge the ALJ's decision. (Pl.'s Compl. [1].) She contends that the ALJ's RFC determination was erroneous because he gave too little weight to the medical statements from her treating physicians, her own testimony, and other evidence in the record, and gave too much weight to the findings of the

---

[1]        The Administrative Record is found in the docket at [10].

agency consultants. (Pl.'s Mem. [21] at 1.) She asks the court to reverse and set aside the Commissioner's decision or, in the alternative, remand the case for further proceedings. (Pl.'s Compl. at 2.) The Commissioner filed a motion for summary judgment [28] with an accompanying memorandum [29], Van Buskirk filed a reply [38], and the Commissioner filed a sur-reply [40]. For the reasons explained herein, the court concludes that several of the ALJ's explanations are inadequate to support his conclusions, and the court remands the case pursuant to Sentence Four of 42 U.S.C. § 405(g).

## BACKGROUND

Francis Van Buskirk, born on August 7, 1967, claims to have become disabled on January 10, 2015, at the age of 47. (Pl.'s Mem. at 3.) Van Buskirk has a high school education. (R. 27.) Prior to January 10, 2015, she worked as an in-home licensed practical nurse (LPN), where her duties involved lifting patients, administering medications, performing housework, and cooking. (R. 46.) Before that, Van Buskirk worked as an LPN in a nursing home. (R. 47.) She stopped working because of pain in her back and gastrointestinal issues. (R. 49.) Van Buskirk's medical history, including difficulties with her back, legs, gastrointestinal system, and mental health, is discussed below.

**I. Medical Records[2]**

**A. Back and Leg Pain**

Van Buskirk's medical notes in the record date back to August 2011, several years before the onset date. (R. 849.) They show that over the years from 2011 to the time of her application, Van Buskirk saw a host of medical care providers for her back and leg pain. First, in August 2011, Van Buskirk was seen by Dr. Mohammed A. Siddiqui, who wrote that Van Buskirk had a "medical

---

[2] In the more than 1000 pages of exhibits in the administrative record, there is extensive discussion of medical issues beyond those that were the focus of the ALJ decision and the parties' arguments before this court. The court's discussion of Van Buskirk's medical history is not exhaustive; the court draws from Van Buskirk's own description of her medical history in her memorandum, to the extent it is supported by the record. (*See* Pl.'s Mem. at 3-9.)

history of depression, anxiety, and chronic lower back pains," and that she was presently suffering from chest pains, hyponatremia,[3] and osteoarthritis.[4] (*Id.*) In February 2012, Van Buskirk had surgery for a herniated disk to treat what she described as "constant" back pain. (R. 1154.) Two months after the operation, Van Buskirk saw Dr. Marc A. Levin for a postoperative visit. (R. 785.) According to his notes, she was "doing quite well," was "quite happy with the results of the surgery," and "[s]he basically ha[d] no back pain, no left leg pain." (*Id.*) Van Buskirk returned to work on April 10, 2012. (*Id.*)

In May 2013, x-rays showed Van Buskirk had mild scoliosis[5] and degenerated discs.[6] (R. 845.) On January 14, 2015—just days after the alleged date of onset for disability—Dr. Siddiqui referred Van Buskirk to Saint Mary Open MRI to obtain imaging of her back. (R. 572.) The images showed degenerative lumbar spondylosis,[7] mild stenosis,[8] paraspinal soft tissue edema,[9] a

---

[3]     Hyponatremia is a decreased concentration of sodium in the bloodstream that can lead to symptoms of weakness and confusion. *See* https://www.tabers.com/tabersonline/view/Tabers-Dictionary/751610/all/hyponatremia (last visited February 11, 2022). The condition is "extremely common" and can be caused by dehydration, a drug side effect, congestive heart failure, or renal failure. *Id.*

[4]     Osteoarthritis is the deterioration of cartilage in joints and vertebrae, which can cause pain, stiffness, impaired gait, and decreased mobility. *See* https://www.tabers.com/tabersonline/view/Tabers-Dictionary/747141/0/osteoarthritis (last visited February 11, 2022).

[5]     Scoliosis is a lateral curvature of the spine which can cause backache and fatigue. *See* https://www.tabers.com/tabersonline/view/Tabers-Dictionary/763285/all/scoliosis (last visited February 11, 2022).

[6]     Degenerated discs can lead to pain, weakness, numbness, and impaired movement. *See* https://medlineplus.gov/genetics/condition/intervertebral-disc-disease (last visited February 11, 2022).

[7]     Degenerated lumbar spondylosis can "cause pressure on nerve roots with subsequent pain or paresthesia in the extremities." *See* https://www.tabers.com/tabersonline/view/Tabers-Dictionary/755780/all/spondylosis (last visited February 11, 2022).

[8]     Stenosis is a narrowing of the openings where spinal nerves leave the spinal column. *See* https://medlineplus.gov/ency/article/000441.htm (last visited February 11, 2022).

[9]     Edema is a condition in which body tissues contain an excessive amount of tissue fluid. *See* https://www.tabers.com/tabersonline/view/Tabers-Dictionary/766687/all/edema (last visited February 11, 2022).

Tarlov cyst,[10] and a tear of the L4-L5 disc "which may produce pain."  (R. 573-74.)  Later in January 2015, Dr. Siddiqui referred Van Buskirk to Dr. Mohammad S. Shukairy, who noted that she had "[c]hronic low back pain related to lumbar degenerative disk disease and lumbar stenosis," but also noted that "[t]he patient does need a bit of further workup to assess her condition more carefully."  (R. 1250.)  A CT scan and x-rays taken at Dr. Shukairy's direction in February 2015 confirmed bulging disks, whereas the "lumbar spine x-rays did not show subluxation."  (R. 1260.)  Dr. Shukairy wrote that "the patient's spinal stenosis is relatively mild," and thus he did "not recommend any surgical intervention for her at this time."  (*Id.*)  Instead, he wrote that "[s]he is recommended to try conservative treatment with Pain Clinic evaluation and injections and continued home exercise program."  (*Id.*)

The following month, however, Van Buskirk saw Dr. Shariq Ibrahim for evaluation of her back pain.  (R. 560.)  During the evaluation, Van Buskirk rated her pain at 10 on a scale from 1 to 10 and reported that it was made worse by standing and sitting, but the pain eased with medication.  (*Id.*)  Dr. Ibrahim noted that Van Buskirk was taking opiates, NSAIDs, and muscle relaxants.  (*Id.*)  To help alleviate the pain, Van Buskirk underwent joint injections.  (R. 561.)  But when she followed up with Dr. Ibrahim in May 2015, she stated that the injections did not help.  (*Id.*)  Dr. Ibrahim concluded that the options at that point were "limited;" further interventions were not "likely to be beneficial" because Van Buskirk did "not appear to have a surgically correctable issue."  (R. 565.)  Dr. Ibrahim also noted concern about "chronic opiate use" and recommended Van Buskirk see a pain psychologist and try aquatic therapy.  (*Id.*)

On October 21, 2015, Van Buskirk saw a physical therapist, Horacio Ferrario, who performed a lumbar examination (R. 641-45.)  Ferrario noted several activity limitations, including

---

[10]        "Tarlov cysts are sacs filled with cerebrospinal fluid that most often affect nerve roots in the sacrum, the group of bones at the base of the spine."  https://www.ninds.nih.gov/ Disorders/All-Disorders/Tarlov-Cysts-Information-Page (last visited February 11, 2022).  The cysts can "compress nerve roots, causing lower back pain."  *Id.*

"pushing/pulling, lifting/carrying objects (such as shopping and laundry), household activities (such as making bed, washing floors/walls and cooking,[)] personal care (washing, dressing, etc[.]), rising, recreational activities, sleeping/turning in bed, sitting/driving, social life, standing, straightening/standing upright, traveling, walking." (R. 643.) During their sessions, Ferrario had Van Buskirk perform various exercises and administered electrical stimulation. (R. 647.)

In December 2015, x-rays showed that Van Buskirk had degenerative disc disease affecting the lumbar spine and scoliosis. (R. 1062.) An MRI performed later that month showed "findings unchanged significantly since last exam." (R. 831.) In January 2016, Van Buskirk had several x-rays taken of her back, and those revealed "no hardware complications," "[m]ild degenerative disc disease," and "osteoarthritis affect[ing] the lower lumbar spine." (R. 1075.) In May 2016, Van Buskirk went to the hospital due to pain and was diagnosed with "[c]hronic low back pain with sciatica"[11] and "[f]ailed back syndrome."[12] (R. 1050.)

In July 2016, Van Buskirk presented to Cardiovascular Consultants, P.C., complaining of leg pain that began "12 month(s) ago." (R. 873.) She described the pain as "sharp, dull, aching, burning, stinging, throbbing, squeezing and heavy," and noted other symptoms including swelling. (*Id.*) The medical notes state that the symptoms "are exacerbated by direct pressure, weight bearing and walking," and the symptoms "are relieved by rest and elevation." (*Id.*) In August 2016, Van Buskirk presented to the emergency room at Community Healthcare System complaining of redness and pain in both legs, worse on the right. (R. 960.) A venous ultrasound showed, similar to the January 2015 MRI, edema of both legs. (R. 970.)

---

[11] Sciatica is a condition in which pain runs down the back and into the legs. *See* https://www.tabers.com/tabersonline/view/Tabers-Dictionary/767366/all/sciatica (last visited February 11, 2022).

[12] Failed back syndrome is "[p]ersistent or recurring low back pain (with or without sciatic symptoms) in patients who have undergone one or more surgeries on a lumbar disk." *See* https://www.tabers.com/tabersonline/view/Tabers-Dictionary/755519/all/failed%20back%20surgery%20syndrome (last visited February 11, 2022).

In November 2016, Van Buskirk again had back x-rays, which showed continued mild degenerative disc disease.  (R. 1053.)  On December 1, 2016, Van Buskirk was in a motor vehicle accident and was taken to the emergency room, where she was diagnosed with a lumbar strain, in addition to a minor head injury and abdominal contusion.  (R. 1022.)   Notes from the attending nurse, Marcella Ann High, state that Van Buskirk "ambulated from [the emergency department] w[ith] steady gait," and that she later "ambulated to restroom with no signs of distress."  (R. 1022-23.)

Plaintiff saw Dr. Avd-Alruaf Noghnogh on January 4, 2017, and she complained at that time of "[c]hronic [m]ild to [s]evere aches and pains associated with car accident."  (R. 1088.)  She specified that she had "more pronounced pain in lower back and tail bone."  (*Id.*)  She also complained of "chest tightening and [c]hronic [d]iarrhea" but "denie[d] any other symptoms."  (*Id.*)

Additional back x-rays on March 21, 2017 yielded results "similar to the prior exam" from November 2016.  (R. 1044, 1046.)

### B.      Fecal Incontinence and Rectal Prolapse

Van Buskirk has a history of fecal incontinence and rectal prolapse[13] dating back to when her second child was born in 1990.  (R. 424-25, 508.)  She explained that she had a tear during the birth that extended to her anus which needed to be "stitched up."  (R. 508.)  Following that birth, she also had occasional diarrhea and chronic incontinence.

Dr. Siddiqui referred Van Buskirk to Dr. Anders Mellgren, a surgeon; Dr. Mellgren's report from the visit notes that Van Buskirk said she has daily accidents, and that she has to wear adult diapers to prevent her stool from leaking out.  (*Id.*)  She also reported having issues with her rectal tissues coming out during bowel movements, and that another doctor had diagnosed her as suffering from rectal prolapse.  (*Id.*)

---

[13]      A prolapse is a "falling or dropping down of an organ or internal part." https://www.tabers.com/tabersonline/view/Tabers-Dictionary/768001/all/prolapse   (last   visited February 11, 2022).

Van Buskirk had a rectopexy[14] performed on February 20, 2015. (R. 424-25.) The discharge summary following her operation states that the reason for the rectopexy was that "most of the treatment options for treating the fecal incontinence will probably not work well as long as patient has this prolapse." (R. 542.) But the medical staff also explained to Van Buskirk that she had "only a 50% chance" that the surgery would improve continence. (*Id.*)

In April 2015, Van Buskirk returned for a post-surgery follow up. (R. 430.) She told the surgeon, Dr. Anders Mellgren, that she was "quite pleased" that she no longer had prolapse, but that she "still has some fecal incontinence" and "has quite a few accidents still." (*Id.*)

On November 17, 2015, Van Buskirk went to the Immediate Care facility complaining of urinary frequency and lower abdominal pain. (R. 901.) She was diagnosed with dysuria.[15] (R. 906.)

On October 7, 2016, Van Buskirk underwent a colonoscopy, which revealed "Grade I internal hemorrhoids." (R. 864.)

### C. Depression, Anxiety, and Other Mental Health Issues

On June 19, 2015, Van Buskirk underwent a consultative examination performed by Dr. Jennifer Hambaugh, a psychologist. (R. 567-70.) Dr. Hambaugh described Van Buskirk as "cooperative" and "alert," with a "positive" mood (R. 567, 569), but diagnosed her as suffering from "Major Depressive Disorder, Recurrent, Mild." (R. 570.)

On October 12, 2015, Van Buskirk began seeing the psychiatrist Dr. Kumar Moolayil. Dr. Moolayil's notes of that date document "depression" but "[n]o suicidal/homicidal intent." (R. 637.) During a subsequent visit on December 7, 2015, Dr. Moolayil's notes state that she appeared

---

[14]     A rectopexy is a surgical operation to pull the rectum upwards and secure it to the back wall of the pelvis. *See* https://fascrs.org/patients/diseases-and-conditions/a-z/rectal-prolapse-expanded-version (last visited February 11, 2022).

[15]     Dysuria is the medical term for painful or difficult urination. *See* https://www.tabers.com/tabersonline/view/Tabers-Dictionary/737720/0/dysuria (last visited February 11, 2022).

"shabby" and showed "some paranoia" but was "cooperative." (R. 703-07.) Dr. Moolayil wrote that Van Buskirk was "oriented to time place person," had "recent memory 3/3," but was unable to count down from 100 by sevens. (R. 707.) Dr. Moolayil entered prescriptions for Effexor, Seroquel, and Lamictal.[16] Dr. Moolayil's treatment notes show that he continued to adjust Van Buskirk's medications throughout 2016 to treat anxiety, depression, and mood swings. (R. 776-84, 1081.)

In August 2016, Van Buskirk began seeing Dr. Cheryl Saafir, a psychologist, to treat her conditions of "depression" and "bipolar" disorder. (R. 767-74.) Dr. Saafir's notes from these sessions state that Van Buskirk felt "hopeless," her short-term memory "has been horrible," she "experienced suicidal ideation," she was "overwhelmed," and she was "doing a lot of crying." (R. 769-72.) By late September, Van Buskirk reported that she felt "like a zombie," and Dr. Saafir noted a "flat affect, appears drowsy." (R. 767.) However, Van Buskirk also stated that she felt the "depression [was] lifting," as she was "[e]xperiencing more drive/motivation—leaving the home more." (*Id.*)

Dr. Moolavil continued to manage Van Buskirk's medications into 2017. (R. 1079.) On February 20, 2017, Dr. Moolavil noted that Van Buskirk's anxiety had increased, and so he increased her prescription for Klonopin.[17] (R. 1080.)

---

[16] Effexor (brand name for Venlafaxine) is used to treat depression. *See* https://medlineplus.gov/druginfo/meds/a694020.html (last visited February 11, 2022). Seroquel (brand name for Quetiapine) is used along with other medications to treat depression or bipolar disorder. *See* https://medlineplus.gov/druginfo/meds/a698019.html (last visited February 11, 2022). Lamictal (brand name for Lamotrigine) is an anticonvulsant used to treat epilepsy and can also help treat abnormal moods. *See* https://medlineplus.gov/druginfo/meds/a695007.html (last visited February 11, 2022).

[17] Klonopin (brand name for Clonazepam) is used to relieve panic attacks. *See* https://medlineplus.gov/druginfo/meds/a682279.html (last visited February 11, 2022).

## II.     State Agency Reviewing Physicians and Psychologists

On January 16, 2015, Van Buskirk applied for disability insurance benefits.  (R. 227.) Between July and December 2015, Van Buskirk saw four medical consultants in connection with her application.  Those consultants produced brief summaries of their examinations.

### A.     Dr. Williamson

Dr. Gayle Williamson, a psychologist, evaluated Van Buskirk on July 7, 2015.  (R. 98-99.) Dr. Williamson found that Van Buskirk's affective disorder[18] was "Non Severe," and that it did not restrict Van Buskirk's daily activities, did not impose difficulties in maintaining social functioning, imposed only mild difficulties in maintaining concentration, persistence, or pace, and did not cause episodes of decompensation.[19]  Dr. Williamson found it "reasonable for claimant to have some symptoms of depression secondary to life circumstances, physical issues, as well as financial stressors.  This is a non-severe impairment."  (R. 99.)

### B.     Dr. Gotanco

On July 10, 2015, Dr. Reynaldo Gotanco (whose specialty is unidentified) determined Van Buskirk was "Not Disabled" after finding she could occasionally lift 20 pounds, frequently lift 10 pounds, and stand or walk for six hours in an eight-hour workday.  (R. 100-03.)  Dr. Gotanco also wrote that Van Buskirk's gait was "intact," and her strength was within normal limits.  (R. 101.)

### C.     Dr. Gilliland

On December 15, 2015, Dr. David Gilliland, a psychologist, assessed Van Buskirk as being "[c]ooperative, slight psychomotor agitation, shabby appearance, depressed, labile mood,

---

[18]     Affective disorders are "marked by a disturbance of mood accompanied by a full or partial manic or depressive syndrome that is not caused by any other physical or mental disorder."     *See*     https://www.tabers.com/tabersonline/view/Tabers-Dictionary/751443/all/affective%20disorder (last visited February 11, 2022).

[19]     Decompensation is "a breakdown in an individual's defense mechanisms, resulting in progressive loss of normal functioning or worsening of psychiatric symptoms."  *See* https://dictionary.apa.org/decompensation (last visited February 11, 2022).

no hallucinations, some paranoia, no suicidal or homicidal intent, oriented x3, able to name president but not prior president, recent memory 3/3." (R. 112-14.) Dr. Gilliland also noted no history of suicidal ideation.[20] (R. 114.) Dr. Gilliland wrote that "claimant presents with severe mental impairment, but medical evidence does not support marked mental functional limitations." (*Id.*) He also wrote that Van Buskirk was "mentally capable of performing simple tasks in a routine schedule with reasonable rest periods." (R. 119.)

### D. Dr. Madala

On December 17, 2015, Dr. Vidya Madala (whose specialty is, again, unidentified) determined Van Buskirk was "Not Disabled" after finding she could occasionally lift 20 pounds, frequently lift 10 pounds, and stand or walk about six hours in an eight-hour workday. (R. 116-20.) He stated that she could occasionally climb ladders/ropes/scaffolds, frequently climb ramps/stairs, and had no limitation kneeling or crawling. (R. 116-17.) At the end of his assessment, he stated that Van Buskirk had the capability to do "light" work.

## III. Medical Source Statements by Van Buskirk's Treating Physicians

### A. Dr. Siddiqui

On December 7, 2015, Dr. Siddiqui prepared a residual function capacity medical source statement. (R. 708-11.) As the Commissioner notes in his brief, Dr. Siddiqui assessed

> very extreme limitations, including that plaintiff could rarely lift up to 10 pounds, could not walk a city block without rest or severe pain, needed to lie down about four hours in an eight hour workday, could only sit four hours in an eight hour workday, needed 30 minute unscheduled breaks every 30 minutes, had bladder/bowel control problems that would limit her ability to work, would be off task over 30% of the workday, and needed to be absent five or more days per month.

(Def.'s Mem. [29] at 8-9 (citing R. 708-11).)

---

[20]     This assessment occurred prior to Dr. Saafir making note of Van Buskirk's suicidal ideation.

### B.    Dr. Moolayil

On April 10, 2017, Dr. Moolayil prepared a "Medical Assessment of Ability to do Work-Related Activities (Mental)."  (R. 1082.)  He rated as "poor" Van Buskirk's ability to relate to co-workers, deal with the public, interact with a supervisor, deal with work stress, understand and carry out complex job instructions, and behave in an emotionally stable manner.  (R. 1082-83.)  He rated as "fair" her ability to follow work rules, use judgment, function independently, maintain attention/concentration, understand and carry out non-complex and simple job instructions, maintain personal appearance, and relate predictably in social situations.  (*Id.*)  The condition that was the "basis for [his] assessment" was Van Buskirk's "[b]ipolar depression."  (R. 1083.)

### C.    Dr. Noghnogh

On April 12, 2017, Dr. Noghnogh filled out the same Physical Residual Function Capacity Medical Source Statement form that Dr. Siddiqui had completed one and a half years earlier.  (R. 1112-15.)  Dr. Noghnogh's assessment was virtually identical to that of Dr. Siddiqui.[21]

## IV.    May 31, 2017 Hearing

Van Buskirk's claim was denied on December 18, 2015.  (R. 16.)  She filed a written request for a hearing on January 8, 2016, and on May 31, 2017, she appeared with counsel for a hearing in Oak Brook, Illinois.  (*Id.*)  Brian L. Harmon, an impartial vocational expert, also appeared at the hearing.  (*Id.*)

---

[21]    Over the course of the four pages of the form, almost every line is identically checked or left unchecked.  In addition, most of the handwritten notes are identical.  One example of the similarity of the two doctors' forms is especially striking.  On the third page, the form asks: "While engaging in occasional standing and walking, must your patient use a cane, quad cane, walker, wheel chair or other assistive device(s) and will it/they affect your patent's ability to ambulate?"  (R. 1114.)  Both doctors checked the line for "Yes," and both left blank the lines to designate "All surfaces," "Uneven/sloped surfaces," or "Prolonged ambulation."  (*See* R. 710, 1114.)  And—though the form does not explicitly request as much—both doctors circled the word "cane" in the question and wrote the word "sometimes" to the right of the circle.  (*Id.*)  The court considers further below whether, as the Commissioner appears to argue, this peculiar level of similarity undermines confidence in Dr. Noghnogh's report.

### A.     Plaintiff's Testimony

Van Buskirk testified before the ALJ that she had significant pain in her lower back, and that there was "popping and cracking" when she stretched.  (R. 49.)  She said that walking and sitting "more than 20, 30 minutes" made the pain worse.  (R. 55.)  She stated she could only walk "about a half of a city block" before she felt increased pain, and that after walking a city block the pain "would be probably about a seven" on a 10-point scale.  (R. 55-56.)  Van Buskirk stated that when she felt pain, she would relieve it by sitting down and taking pain medication; she began elevating her legs in response to swelling that had begun around 2014, but doing so did not help much.  (R. 56, 57.)  She further stated that she "can barely do anything around the house," and that after using a handheld vacuum on a single room, she has to "sit down and take a break." (R. 64.)  When she washes dishes, she has to take a break after five minutes.  (R. 65.)

Van Buskirk testified that surgery to repair the rectal prolapse did not stop her chronic diarrhea, and that she had already had two episodes on the day of the hearing.  (R. 58.)  She explained that she has to carry around an extra pair of clothes because she "could go anywhere from five to ten times a day."  (R. 58.)  She noted that this problem interrupted her work as a caregiver; for example, she would be with a "home patient that was on the ventilator," and she would be "suctioning him and the urge would come and sometimes [she] would be incontinent." (R. 59.)  Even so, when she was working, "[i]t wasn't as severe as it is now."  (*Id.*)  At the time of her testimony, she stated she had just "about five seconds" warning after she feels a bowel movement coming on, and that she was incontinent about three times a day.  (R. 60, 61.)  For that reason, she occasionally wears adult diapers, and nevertheless can have accidents because diarrhea sometimes leaks from the diapers.  (R. 60-62.)

Van Buskirk stated that she does not leave the house unless she "absolutely" has to. (R. 65.)  She explained that she has "generalized anxiety," particularly when she leaves the house or is around a group of more than 10 people.  (R. 66-67.)  She stated she had previously suffered

from panic attacks, but that those stopped in 2014. (R. 66.) She also explained that she suffers from depression, feels "down all the time" and has been "diagnosed with bipolar." (R. 67.)

### B. Vocational Expert Testimony

Brian L. Harmon, an impartial vocational expert, testified that the skills Van Buskirk acquired from her prior occupations as a nurse assistant and an LPN are transferable to light or sedentary work. (R. 73.) Harmon identified skills such as active listening, monitoring, and service orientation. (*Id.*) The administrative law judge then described certain limitations, including a limit of lifting 20 pounds occasionally and 10 pounds frequently, standing and walking with only five-minute breaks every hour, walking on steady terrain only, occasionally climbing ramps or stairs, working at an average pace, and working around no more than 10 people. (R. 73-75.) Harmon stated that a person with those limitations could not perform Van Buskirk's prior jobs but could work as a cashier, rental clerk, or companion. (R. 75-78.) Harmon stated that even with an additional limitation of needing to use a cane for prolonged walking more than five minutes, a person could still work in those three occupations. (R. 83.)

The ALJ also asked Harmon about bathroom breaks. Harmon stated that individuals in competitive work can take two 15-minute breaks, a half-hour break for lunch, and typically another quick bathroom break; any additional breaks would be problematic. (R. 81.) Harmon noted that "the problem becomes where if an individual is unable to manage or control their bowels and they have to go take a bathroom break or they can't control it but they have to perform their job duties." (R. 82.) The ALJ asked Harmon specifically about work as an in-home companion, and whether that job might still be possible with frequent bathroom breaks. Harmon responded that such breaks would still be an issue, and he noted that a patient with dementia could wander off while the companion was in the bathroom. (R. 82-83.)

### DISCUSSION

### I. Legal Framework

The Social Security Act authorizes judicial review of final decisions of the Commissioner

of Social Security. *See* 42 U.S.C. § 405(g). The Appeals Council denied Van Buskirk's request for review, making the ALJ's denial of benefits the final decision in this case. *See Thompson v. Berryhill*, 722 F. App'x 573, 579 (7th Cir. 2018). In reviewing that decision, the court considers whether the ALJ's findings were supported by "substantial evidence," 42 U.S.C. § 405(g), and whether the ALJ's decision was "the result of an error of law." *Farrell v. Astrue*, 692 F.3d 767, 770 (7th Cir. 2012) (citation omitted). "Substantial evidence" in this context means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citation omitted). It is not the court's role to "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the" ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (citation omitted). At the same time, the court will not "rubber-stamp" the ALJ's decision. *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018). Rather, the court considers whether the ALJ has built "an accurate and logical bridge" between the evidence and his conclusion. *Jeske v. Saul*, 955 F.3d 583, 587 (7th Cir. 2020) (citation omitted); *see also Scrogham v. Colvin*, 765 F.3d 685, 695 (7th Cir. 2014) ("We conduct a critical review of the evidence, considering both the evidence that supports, as well as the evidence that detracts from, the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues.") (internal quotation marks omitted).

Van Buskirk is deemed "disabled" under the Social Security Act if she is unable to engage in "substantial gainful activity" due to a medically determinable physical or mental impairment. 42 U.S.C. § 423(d)(1)(A). The term "substantial gainful activity" is construed broadly; Van Buskirk is not disabled unless she can show that she is "not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled, the ALJ follows the five-step sequential process described in 20 C.F.R. §§ 404.1520, 416.920. Those regulations require the ALJ to

determine (1) whether the claimant is engaged in substantial gainful activity; (2) if not so engaged, whether she has a severe impairment (or combination of severe impairments); (3) if severely impaired, whether hers is one of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not listed there, whether she can perform her past relevant work given her RFC (which is based on all her impairments, not just the severe ones); and (5) if she cannot perform her past work, whether she can perform any other work, given her RFC, age, education, and work experience. *See Cerentano v. UMWA Health & Ret. Funds*, 735 F.3d 976, 980 (7th Cir. 2013) (citing 20 C.F.R. § 404.1520).

## II.     The ALJ's Decision

The ALJ concluded, in a December 26, 2017 decision, that Van Buskirk was not disabled during the insured period under sections 216(i) and 223(d) of the Social Security Act. (R. 28.) At step one in his ruling, the ALJ found that Van Buskirk met the insured status requirements of the Social Security Act through December 31, 2017, and that she was not engaged in substantial gainful activity since the onset date of January 10, 2015. (R. 18.) At step two, he determined that Van Buskirk had the following three severe impairments: degenerative disc disease, gastrointestinal difficulties including short bowel disorders and residual effects of colon surgery, and affective disorder. (*Id.*) He further found that those impairments "significantly limit the ability to perform basic work activities." (*Id.*) At step three, the ALJ determined that Van Buskirk did not have an impairment or combination of impairments that meets the severity of one of the impairments listed in the relevant section of the Social Security Act. (*Id.*)

Between steps three and four, the ALJ, "[a]fter careful consideration of the entire record," found that Van Buskirk

> has the residual functional capacity to lift and/or carry up to 20 pounds occasionally and 10 pounds frequently, and has no limitations in the total amount of time she is able to sit, stand or walk throughout an 8 hour workday. The claimant needs to alternate her position between sitting, standing, and walking for no more than five minutes out of every hour. While doing so, she would not need to be off task. She can operate foot controls occasionally. She is able to ambulate effectively, but should not be required to perform excessive ambulation on uneven surfaces. The

claimant can occasionally climb ramps and stairs, and she can occasionally stoop, kneel, balance, crouch and crawl, but she can never climb ladders, ropes or scaffolds. The claimant is limited to working in non-hazardous environments, i.e., no driving at work, operating moving machinery, working at unprotected heights or around exposed flames and unguarded large bodies of water, and she should avoid concentrated exposure to unguarded hazardous machinery. She is not capable of work requiring significantly above average production pace, and she ought not work in crowded or hectic environments where she would be among 10 or more people.

(R. 20-21.)

Three issues discussed by the ALJ in the portion of his ruling determining Van Buskirk's RFC are of primary relevance on this appeal. First, the ALJ stated that he gave "great weight to the opinions of the State agency medical consultants," but gave "no weight" to the medical source statement of Dr. Siddiqui and "little weight" to the statement of Dr. Noghnogh. (R. 24-25.) In the ALJ's view, "[t]he limitations provided by Dr. Moolayil are excessive and are not supported by his handwritten notes." (R. 26.) As for Van Buskirk's sessions with Dr. Saafir, the ALJ noted "some exacerbated bouts of depression," but emphasized certain medical notes that stated Van Buskirk's depression was "lifting," she had a "stable mood," and that "the intensity and frequency of [her] symptoms ha[d] diminished." (R. 25.)

Second, the ALJ discussed Van Buskirk's gastrointestinal issues and her alleged need for a cane. The ALJ stated: "I expressly reject the claimant's allegations regarding the frequency and severity of her gastrointestinal difficulties. If the claimant experienced diarrhea as severe as alleged, I would expect greater mention of such difficulties and more aggressive treatment in the medical records." (R. 22.) Regarding her need for a cane, the ALJ found the evidence concerning "[c]laimant's gait was unclear because the doctor stated that the claimant was using a cane and her gait was slow and cautious but also stated claimant's gait was normal." (R. 23.) "In any event," the ALJ continued, "her use of the cane was not consistent." (*Id.*)

Third, the ALJ discounted claims made by Van Buskirk during her testimony. The ALJ stated that "the claimant's statements concerning the intensity, persistence and limiting effects of

[her alleged] symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. 21.) These three issues pertaining to the RFC are discussed further below.

At step four, the ALJ determined—as the impartial vocational expert had also stated—that Van Buskirk was unable to perform any past relevant work. (R. 26.) But at step five, the ALJ found that Van Buskirk could perform other work, such as the jobs of cashier, rental clerk, or companion. (R. 27.) Notably, the ALJ cited testimony from the vocational expert that "even if the claimant needed to use a cane for prolonged walking more than five minutes, the individual could perform the above listed jobs." (R. 28.) And while the ALJ found that Van Buskirk did not have the RFC to perform the full range of light work, he agreed with the analysis of the vocational expert that she had skills—learned from past relevant work—that would transfer to the companion job. (R. 27-28.) The companion job, he found, involved "the same/ similar process as . . . performed within the medical industry" but required the "same / lesser degree of skill" and was "less demanding as far as job duties and skill required." (R. 28.) Thus, "[b]ased on the testimony of the vocational expert," and "considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (*Id.*) As a result, "[a] finding of 'not disabled' is therefore appropriate under the framework of the [Social Security Act] rules." (*Id.*)

## III.   Analysis

Van Buskirk argues that the ALJ made an RFC finding that was unsupported and contrary to the evidence. Specifically, Van Buskirk argues (1) the ALJ failed to properly evaluate the medical opinion evidence, (2) the ALJ disregarded evidence regarding her need to use a cane and her need for frequent bathroom breaks, and (3) the ALJ did not adequately consider her subjective symptom testimony. (*See* Pl.'s Mem.) The Commissioner argues that substantial evidence supports the ALJ's RFC finding. (Def.'s Mem. at 2.)

### A. Medical Opinion Evidence

Federal regulations require an ALJ to consider six factors when evaluating what weight to assign a medical opinion: (1) the doctor's examining relationship; (2) the doctor's treating relationship; (3) whether the opinion includes supporting evidence; (4) whether the opinion is consistent with other evidence in the record; (5) whether the doctor is a specialist; and (6) any other factor which "tend[s] to support or contradict" the opinion. 20 C.F.R. § 404.1527(c). The opinion of a treating physician "regarding the nature and severity of a medical condition" is entitled to "controlling weight" unless the ALJ sets out "good reasons" for assigning it lesser weight.[22] *Id.* § 404.1527(c)(2); *Walker v. Berryhill*, 900 F.3d 479, 485 (7th Cir. 2018). The Seventh Circuit has found an ALJ has "good reason" to assign an opinion less weight when it is not supported by "objective medical evidence," *Ghiselli v. Colvin*, 837 F.3d 771, 776 (7th Cir. 2016), or when it is "inconsistent with the record." *Rainey v. Berryhill*, 731 F. App'x 519, 523 (7th Cir. 2018).

When an ALJ declines to assign controlling weight to a treating physician's opinion, the ALJ must do more than merely state a "good reason" for doing so; instead, the ALJ must "adequately articulate" his reasons such that the reviewing court "can follow [the ALJ's] reasoning." *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015). Then, the ALJ must determine what weight the opinion is to be afforded by applying factors (3) through (6) above, in addition to considering the length, nature, and extent of the treatment relationship, and the frequency of examination. 20 C.F.R. § 404.1527(c)(2).

As explained below, the court does not see here the sort of logical bridge necessary for meaningful appellate review. The ALJ appears to have settled on an RFC that is located somewhere between the findings of Van Buskirk's treating physicians and the findings of the state

---

[22] Subsequent regulations eliminated this rule, but that change is effective only for claims filed after March 27, 2017, and thus does not apply to this case. *See* 20 C.F.R. § 404.1520c.

agency medical consultants, without explaining reasons for that conclusion. The Commissioner accurately argues that only the ALJ looks at the record as a whole, and thus the RFC determination is the ALJ's responsibility alone. (Def.'s Mem. at 2-4; *see* 20 C.F.R. § 404.1546(c).) But that determination must be paired with an explanation sufficient for the reviewing court to determine whether it is "supported by substantial evidence." 42 U.S.C. § 405(g). The ALJ has not done so here.

### 1.    Dr. Siddiqui

Dr. Siddiqui's December 2015 medical source statement assessed limitations that were more severe than the ALJ's RFC finding. Among these more-severe assessments were that Van Buskirk could lift less weight; was more limited in the amount of time she could sit, stand, or walk; required more frequent and longer breaks from work; and would more often be off-task. (R. 20-21, 25.) The ALJ gave "this opinion no weight" because he found "no support for the profound limitations expressed by Dr. Siddiqui in either his own treatment notes . . . or in the record as a whole." (R. 25.) While Dr. Siddiqui's treatment notes from 2011 to 2015 are difficult to read, many appear to state that Van Buskirk was negative for diarrhea and incontinence, that she did not have weakness in her arms or legs, and that she had normal motor, sensory, and gait. (*See* R. 718-35, 796-863.)

Van Buskirk argues that—with respect to the medical opinions of Dr. Siddiqui as well as her other treating physicians—the ALJ failed to "explicitly apply the checklist" of factors, which "can be grounds for remand." (Pl.'s Reply [38] at 2-3.) Indeed, the Seventh Circuit has criticized ALJs for not "explicitly address[ing] the checklist of factors as applied to the medical opinion evidence." *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010). Some caselaw suggests that this failure alone warrants a remand. *See Wallace v. Colvin*, 193 F. Supp. 3d 939, 947 (N.D. Ill. 2016) ("[T]he ALJ did not explicitly apply the checklist. In this Court's view, that failure alone is a ground for a remand."). While the ALJ's asserted reason for giving the opinion "no weight"—that Dr. Siddiqui's opinion was not supported by his treating notes or by the record as a whole—does

gesture towards some of the regulatory factors, the ALJ has not addressed others. He does not, for example, consider the length, nature, or extent of Dr. Siddiqui's treatment relationship. And Van Buskirk notes that Dr. Siddiqui was her "Internal Medicine doctor since at least 2011 and treated her on a monthly basis for all her ailments, including prescribing medications for her back pain." (Pl.'s Mem. at 12; *see* R. 718-35, 793-863.) The regulations direct that such circumstances should make a difference: "Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion." 20 C.F.R. § 404.1527(c)(2)(i). Further, "[w]hen the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the medical source's medical opinion more weight." *Id.* The ALJ must, at a minimum, note this factor and discuss why it does not alter his assessment that Dr. Siddiqui's opinion merits no weight.

Moreover, the ALJ did not effectively explain how the conclusion that the record offers "no support" for Dr. Siddiqui's opinion. The record certainly contains support for some level of physical limitation. Van Buskirk's back issues, for example, are well documented, with numerous diagnoses by several different doctors over the many years covered in the record. (*See, e.g.*, R. 573-74, 643, 831, 845, 849, 1044, 1046, 1050, 1053, 1062, 1260.) The ALJ himself found that Van Buskirk's impairments were significantly limiting, as he determined that she could not perform "the full range of light work." (R. 27.)

To be clear, the court is not suggesting that Dr. Siddiqui's opinion should necessarily be given controlling—or any specific level of—weight. Some of Dr. Siddiqui's treatment notes, mentioned by the ALJ in an earlier portion of his ruling, do seem to be at odds with his medical opinion. For example, during many examinations, Dr. Siddiqui circled "motor wnl,"[23] "sensory

---

[23] "Wnl" is medical shorthand for "within normal limits." https://www.tabers.com/ tabersonline/view/Tabers-Dictionary/744531/0/WNL (last visited February 11, 2022).

wnl," and "gait wnl," and crossed out "weakness in arm & leg." (*See* R. 793-807.) To the extent those notes are in conflict with Dr. Siddiqui's opinion that Van Buskirk could not, for example, walk a city block without rest or pain (R. 25), that may justify assigning the opinion less weight. *See* 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion."). Nevertheless, the ALJ must still build a logical bridge between these regulatory factors and the weight he assigns the opinion. The ALJ's conclusory statement that "[t]here is no support" in "his treatment notes" or "in the record as a whole" will not suffice.

### 2. Dr. Noghnogh

Dr. Noghnogh completed a medical source statement on April 12, 2017 and assessed the same limitations as Dr. Siddiqui. (R. 25, 1112-1115.) Though Dr. Noghnogh arrived at the same conclusion as did Dr. Siddiqui, the ALJ gave Dr. Noghnogh's opinion "little weight." (R. 25.) The court finds it puzzling that, as between two nearly-identical opinions, the ALJ chose to give "little weight" to the one from the doctor with a less-extensive treatment history and "no weight" to the opinion of the doctor with a more-extensive history. Similar to the finding he made regarding Dr. Siddiqui's opinion, the ALJ found that Dr. Noghnogh's opinion was

> not supported by his treatment notes which indicate claimant has no pain in muscles or joints, no limitation of range of motion, no paresthesias or numbness, no depressive symptoms, has no weakness, is in no acute distress, has normal range of motion of her extremities with no edema and no tenderness in her back.

(R. 25.) This is an accurate summary of notes that Dr. Noghnogh made under the headings "subjective" and "review of systems."

But other areas of Dr. Noghnogh's treatment notes complicate the issue. As Van Buskirk argues, she saw Dr. Noghnogh "for her anemia, anxiety, hypothyroidism and hypertension." (Pl.'s Mem. at 13.) That comports with Dr. Noghnogh's statement as to Van Buskirk's "[c]hief complaint" at the top of his forms: "[Patient] is here for a 1 month [follow-up] and management of Anemia, [hypertension], Anxiety disorder and Hypothyroidism." (*See, e.g.*, R. 748.) Thus, it

appears that the main focus of Van Buskirk's visits with Dr. Noghnogh were for medical issues other than, for example, the issues she had with her back. That may help to explain why the doctor stated Van Buskirk had "no pain in muscles or joints" when the rest of the record suggests she had chronic back pain.

Moreover, the ALJ omitted mention of certain notes by Dr. Noghnogh that are in conflict with the ones the ALJ discussed in his ruling. On the treatment notes under the heading "Assessment," there is text that states "[d]iagnoses attached to this encounter," and included in the list is "[l]ower back pain" and "[p]ersonal history of manic depression." (*See, e.g.*, R. 752.) In addition, on certain treatment notes, Dr. Noghnogh states that "[Patient complains of] R leg pain and lower back discomfort du[e] to recent back surgery." (*See, e.g.*, 748, 751.) Finally, under the heading "Plan" on a treatment note, Dr. Noghnogh wrote: "Depression Assessment performed on this visit, Positive measurement findings, advised [patient] to follow up with Psychiatrist for further treatment." (R. 752.) In the same paragraph, Dr. Noghnogh wrote: "Advised [patient] to start Physical therapy as ordered by surgeon ASAP, will give Norco 5/325mg for now for back pain, will start gabapentin" and "Fentanyl." (*Id.*)

The Commissioner argues "the ALJ was not 'cherry picking' [evidence] as plaintiff suggests." (Def.'s Mem. at 12.) But absent an explanation for why these unmentioned notes do not lend support to Dr. Noghnogh's opinion, the court cannot agree. Furthermore, the ALJ does not explain how the record as a whole—beyond Dr. Noghnogh's notes—lends only "little" support to Dr. Noghnogh's opinion. Once again, the ALJ did not discuss the regulatory factors or make a logical bridge between the record and his conclusion.

Finally, both the ALJ and the Commissioner raise a point about the similarity between the medical opinions of Dr. Noghnogh and Dr. Siddiqui. In the ALJ's ruling, he noted that "[t]he responses [Dr. Noghnogh] gave from question 9 through question 20 are identical" to those of Dr. Siddiqui. (R. 25.) The Commissioner reiterates this point: "It is not that just 'some' of [Dr. Noghnogh's] responses to the questions were identical to Dr. Siddiqui's responses, but rather

ALL of the responses regarding plaintiff's functional abilities/limitations were exactly the same of more than 30 questions." (Def.'s Mem. at 11.) The Commissioner continues: "One wonders how Dr. Noghnogh, who practices in Munster, Indiana, would end up with the same exact responses to 30+ questions regarding plaintiff's functional abilities/limitations as Dr. Siddiqui, who practices in Schere[r]ville, Indiana, a year and a half later." (*Id.*)

Neither the ALJ nor the Commissioner elaborate any further. Perhaps it is implied by their comments that they believe Dr. Noghnogh merely copied Dr. Siddiqui's form, and thus did not come to his own independent conclusion. But if that was the ALJ's reasoning, and thus part of his consideration in assigning the opinion little weight, he must state as much. Because, as Van Buskirk points out, the general rule is that "the more consistent a medical opinion is with the record as a whole, the more weight [the ALJ] will give to that medical opinion." (*See* 20 C.F.R. § 404.1527(c)(4); Pl.'s Mem. at 13.) The Commissioner "wonders" how two forms could be so similar, but the court can think of several potential answers, including the possibility that Van Buskirk presented to each doctor in exactly the same condition and with the exact same complaints. Regardless, the court will not read something nefarious into the two opinions' similarity in the absence of the ALJ or Commissioner asserting as much.

### 3. Dr. Moolayil[24]

Dr. Moolayil completed a medical source statement on April 10, 2017 and diagnosed Van Buskirk with bipolar depression. (R. 1082-83.) Dr. Moolayil assessed Van Buskirk with respect to a number of work-related abilities—her abilities to relate to co-workers, to deal with the public, to interact with supervisors, to deal with work stress, and to behave in an emotionally stable

---

[24] Van Buskirk also refers to the "RFC" and "opinion" of treating psychologist Dr. Saafir. (*See* Pl.'s Mem. at 14; Pl.'s Reply at 5.) But Dr. Saafir did not complete a medical source statement. (Def.'s Mem. at 12; R. 767-75, 1127-1148.) Regardless, the primary issues raised by the parties regarding Dr. Saafir are the same as those discussed herein regarding Dr. Moolayil, including whether periods of progress or stability for Van Buskirk undermine more severe diagnoses. As such, the court's conclusions in this section would apply to Dr. Saafir as well.

manner—and concluded those abilities were "Poor/None." (*Id.*) In the ALJ's view, those findings "are excessive and are not supported by his handwritten notes . . . which basically list the medication the claimant is taking." (R. 26.) The ALJ further stated that Dr. Moolayil's "opinion is also not supported by the totality of the evidence." (*Id.*) The ALJ noted that during several visits with other doctors "for her physical impairments, it was noted that the claimant did not have depression and memory loss . . . and had no depressive symptoms." (*Id.*) The ALJ also found that "claimant is able to be in public without evidence of any emotional outbursts." (*Id.*) Finally, the ALJ noted that "[c]laimant's visits to Dr. Moolayil were also sporadic," which the ALJ found relevant because "[g]iven [Dr. Moolayil's] opinion of claimant having extreme mental functional limitations, one would expect more frequent visits to the doctor." (*Id.*)

Van Buskirk argues that because the ALJ did not say how much weight he assigned to Dr. Moolavil's opinion, this conclusion "is impossible to counter." (Pl.'s Mem. at 14.) The court agrees that where the ALJ determines that a treating physician's opinion does not warrant controlling weight, the ALJ must still "determin[e] the weight to give the medical opinion." 20 C.F.R. § 404.1527(c)(2). For example, it appears that the ALJ likely assigned no weight at all to the portion of Dr. Moolayil's opinion that is discussed in the ALJ's ruling—though that is not explicitly stated. But the court is uncertain whether the ALJ assigned any weight to the portions of Dr. Moolayil's opinion that are *not* mentioned in the ALJ's ruling, such as Dr. Moolayil's assessment of "Fair" for Van Buskirk's ability to follow work rules, use judgment, and function independently. (R. 1082.)

Van Buskirk also argues that her symptoms were "fluctuating," and that drawing conclusions from office visits with other doctors where she did not exhibit depression or memory loss "shows a fundamental misunderstanding of mental illness by the ALJ." (Pl.'s Mem. at 14-15.) The Commissioner argues Dr. Moolayil's "extreme opinion" was "not supported by his hand-written notes" and "was in conflict with the observations of other medical sources of record." (Def.'s Mem. at 13.) The Commissioner also argues Dr. Moolayil's opinion is "inconsistent with

the June 2015 consultative psychologist's findings" and "with plaintiff's mother's statement that plaintiff had no difficulties in getting along with others." (*Id.* at 14.)

Both sides cite record evidence in support of these positions. The ALJ and Commissioner refer to the following four medical notes in the record that purportedly contradict Dr. Moolayil's opinion. First, Van Buskirk presented to the Cardiology Associates of NW Indiana-Munster on June 16, 2015 for an evaluation of her edema, and medical notes from the visit state "Not Present—Depression and Memory Loss." (R. 582-83.) Second, she returned to that same location for an evaluation of her back pain on August 26, 2015, and the same statement appears again in her medical notes. (R. 585-86.) The third and fourth citations are to medical notes made by Dr. Noghnogh, which (as discussed above) include the notation of "[n]o depressive symptoms." (R. 1088, 1091.) As noted earlier, Dr. Noghnogh's notes are somewhat equivocal: during one visit, he wrote: "Depression Assessment performed on this visit, Positive measurement findings, advised [patient] to follow up with Psychiatrist for further treatment." (R. 752.)

Dr. Jennifer Hambaugh performed a consultative examination on June 19, 2015 and noted that Van Buskirk "reported having a depressed mood for the past 6 months to a year." (R. 567-70.) Dr. Hambaugh diagnosed Van Buskirk with "Major Depressive Disorder, Recurrent, Mild," but nevertheless believed that Van Buskirk "could usefully participate in the management of her own funds." (R. 570.) As for Van Buskirk's mother's function report, the Commissioner is correct that the mother checked the box "No" for "Does this person have any problems getting along with family, friends, neighbors, or others?" (R. 336, 341.) But unmentioned by the Commissioner is the fact that the mother also wrote Van Buskirk was "extremely depressed" and that "her memory goes sometimes." (R. 337-38.)

For her part, Van Buskirk cites to several of Dr. Moolavil's treatment notes that appear to support the doctor's opinion. (Pl.'s Mem. at 14-15.) For example, over the years, Dr. Moolayil wrote that Van Buskirk's appearance was "shabby," her mood was "depressed" and "labile," she had "some paranoia," she had issues with sleep and low energy, and her anxiety was increasing.

(R. 704-07, 777-79, 782, 1080.)  In other words, contrary to the ALJ's determination that Dr. Moolayil was "basically list[ing] the medication the claimant is taking" (R. 26), the doctor was also making medical and mental health assessments.

The ALJ's reason for (presumably) assigning Dr. Moolayil's opinion little to no weight is that the record does not support the doctor's "excessive" limitations.  Van Buskirk argues that the record does support Dr. Moolayil's opinion because periods of stability or improvement do not mean that mental illness is necessarily overcome; a contrary conclusion, she argues, misunderstands mental health.  The court agrees that—absent further explanation—the ALJ's citations to a few instances where Van Buskirk did not exhibit depressive symptoms does not mean that the treating psychologist's medical opinion was unsupported by the record.

Caselaw in this circuit supports the court's finding.  For example, in *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) the court objected to the ALJ "cherry-picking [the treating psychiatrist's] file to locate a single treatment note that purportedly undermines her overall assessment of [plaintiff's] functional limitations."  The court said that doing so "demonstrated a fundamental, but regrettably all-too-common, misunderstanding of mental illness."  *Punzio*, 630 F.3d at 710.  "As we have explained before," the court continued, "a person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about her overall condition."  *Id.*

In this case, the ALJ did not rest his opinion on a "single" treatment note, as in *Punzio*, but it does appear the ALJ emphasized some evidence without taking account of other information. Dr. Moolayil's treatment notes go beyond medication management to include various medical assessments that are consistent with his medical opinion.  And the ALJ cited to Dr. Noghnogh's treatment notes but declined to mention that Dr. Noghnogh also assessed Van Buskirk as suffering from depression.  The Commissioner cites to Van Buskirk's mother's statement but declines to mention that her mother also noted depression and memory loss.

26

Again, the court is not requiring that, on remand, Dr. Moolayil's opinion be given controlling (or any other) weight. But the ALJ will need to explain how he arrives at his conclusion such that the court can engage in meaningful judicial review. For example, the infrequency of Van Buskirk's visits to Dr. Moolayil is a valid consideration and may merit lowering the weight assigned to the opinion. 20 C.F.R. § 404.1527(c)(2)(i) ("[T]he more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."). However, if the infrequency of Van Buskirk's visits with Dr. Moolayil between 2015 and 2017 undermines the doctor's medical opinion, the ALJ will need to explain why that factor does not prevent him from giving great weight to the one-day consultative examination with Dr. Hambaugh.[25]

It may also be relevant that, as the ALJ stated, Van Buskirk is able to function "in public without evidence of emotional outbursts." (R. 26.) That ability may undermine Dr. Moolayil's assessment of "Poor/None" for Van Buskirk's ability to "[b]ehave in an emotionally stable manner." (R. 1083.) But as an explanation for that finding, the ALJ simply stated that "claimant is able to be in public without evidence of abnormal behavior as evidenced by her going shopping." (R. 19.) In the same paragraph, the ALJ noted that "[c]laimant testified she does not leave the house unless she has to due to anxiety" and that "she has symptoms of her body shaking and becomes very nervous when she has to go out." (R. 19.) The mere fact that Van Buskirk—occasionally and reluctantly—goes shopping does not logically lead to the conclusion that she can behave in an emotionally stable manner on a daily basis in a work environment. *See, e.g.*, *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) ("The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than

---

[25]     The ALJ's note that Dr. Moolayil's finding of "extreme mental functional limitations" leads him to "expect more frequent visits to the doctor" (R. 26) requires further explanation as well. It is unclear why Van Buskirk would be expected to make more visits to her *psychiatrist* when she—like most patients receiving mental health treatment—frequently sees her *psychologist*, Dr. Saafir.

the latter, can get help from other persons . . . and is not held to a minimum standard of performance, as she would be by an employer.").

In short, the ALJ must state the weight, in light of the regulatory factors discussed above, that he assigns to Dr. Moolayil's medical opinion. In doing so, he must take into account the entire record, not just certain treating notes that suggest improvement. As noted earlier, such notes would not necessarily undermine a finding of severe limitations; Van Buskirk can be expected to have "better days and worse days, so a snapshot of any single moment says little about her overall condition." *Punzio*, 630 F.3d at 710. And as for evidence in the record that purports to undermine confidence in Dr. Moolayil's opinion, the ALJ must make a logical bridge that clearly explains *why* that evidence leads to his conclusion.

### 4. State Agency Medical Consultants

The ALJ gave "great weight to the opinions of State agency medical consultants," who "opined that the claimant had the ability to perform light exertional work with postural limitations." (R. 24.) The ALJ acknowledged that certain medical records "were submitted after [the state consultants] rendered their decision," but he found that those records "do not show a reduction in claimant's functionality." (*Id.*) The ALJ nevertheless did acknowledge that Van Buskirk has "additional limitations" beyond those noted by the state consultants. He made this finding "[b]ased on [his] observations and review of the record," but did not identify the record evidence he reviewed and noted just one observation: that "[a]t the hearing claimant altered her position between sitting and standing," which the ALJ "[took] into account in the residual functional capacity." (*Id.*)

Van Buskirk argues the ALJ "basically performs no analysis in adopting the opinions of all the state experts." (Pl.'s Mem. at 15.) She also takes issue with his "offhanded[] dismiss[al]" of the experts' failure to review many of the records—including, for example, statements from Van Buskirk's treating physicians and a significant number of medical notes from doctors including Dr. Moolayil, Dr. Noghnogh, and Dr. Saafir. (*Id.*) The Commissioner argues that the opinions of the

28

state agency physicians are "well-supported" and that the ALJ "reasonably concluded that the record evidence originating after their opinions . . . did not show a reduction in plaintiff's functionality." (Def.'s Mem. at 14.)

Van Buskirk appears to have the better of this argument. The ALJ does not state *why* he gives "great weight" to the opinions of the state agency medical consultants. Nor does the ALJ explain how, "based on [his] observations *and review of the record*," he found that the record does "not show a reduction in claimant's functionality" but also that the record merits some "additional limitations." (R. 24 (emphasis added).) The ALJ does not specify whether the additional limitations he imposed were based on his review of records that pre-dated or post-dated the opinions of the state consultants. Either scenario requires further explanation; if records pre-dating the opinions warranted limitations beyond those found by the state consultants, then it is not clear why the ALJ nevertheless gave those opinions—which should have been informed by those records—great weight. If, rather, it was post-opinion records that led to additional limitations, then it is not clear why the ALJ stated those same records did not show a reduction in claimant's functionality.

In any case, evidence that post-dates the opinions of the state agency medical consultants is significant in that it calls into question the logic of assigning those opinions "great weight." *Cf. Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016) (holding that, where evidence from the plaintiff's treating physician significantly "changed the picture," the ALJ "erred by continuing to rely on an outdated assessment by a non-examining physician"). As noted, the state agency consultants completed their assessments by December 2015. Much of Van Buskirk's medical record, in particular concerning her mental health, comes subsequent to that date. Though the record contains treatment notes from Dr. Moolayil dating as far back as October 12, 2015, the majority of his notes post-date the opinions of the state agency consultants. (*See* R. 637, 700-07, 776-784, 1079-81.) For example, a February 20, 2017 note states that Van Buskirk's anxiety was increasing. (R. 1080.) The state agency consultants also missed the entirety of evidence

provided in the notes of Dr. Saafir, who did not begin seeing Van Buskirk until August 2016. Dr. Saafir's conclusions are mixed; she noted Van Buskirk had depression but also noted that, during one visit, her depression appeared to be lifting. (R. 767-72.) But Dr. Saafir also noted that Van Buskirk "experienced suicidal ideation." (R. 771.) That history is not mentioned by state agency consultant Dr. Gilliland, whose December 15, 2015 opinion simply noted "no suicidal . . . intent." (R. 114.)

Many of the treatment notes pertaining to Van Buskirk's back and legs also post-date the opinions of the state agency consultants. As just one example, the December 1, 2016 motor vehicle accident that caused Van Buskirk to go to the emergency room includes a diagnosis of a lumbar strain. (R. 1022.) The following month, Van Buskirk complained to Dr. Noghnogh about "[c]hronic [m]ild to [s]evere aches and pains associated with [the] car accident," including "more pronounced pain in [her] lower back and tail bone." (R. 1088.) To the extent this motor vehicle accident exacerbated Van Buskirk's back and leg issues, it was not accounted for by the state agency consultants.

In sum, the ALJ failed to adequately explain his determination to assign "great weight" to the opinions of state agency medical consultants. Since the ALJ must "adequately articulate" his reasons such that the reviewing court "can follow [the ALJ's] reasoning," that failure warrants remand. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015).

**B.    ALJ's Findings that Van Buskirk Did Not Need Additional Bathroom Breaks or a Cane**

In making the RFC determination, the ALJ made certain findings regarding Van Buskirk's need for bathroom breaks and her need for a cane. The ALJ addressed the issue of bathroom breaks in detail that contrasts with his assessment of Van Buskirk's leg and back pain and mental health concerns. The ALJ stated:

Claimant testified to the following regarding her diarrhea. Her chronic diarrhea has not stopped. She has 5-10 bowel movements a day with a bowel movement being 15-30 minutes. She has difficulty controlling her bowel movements. She has about 5 seconds warning when she feels a bowel movement coming. She has incontinence in bed, once or twice every couple of months. She has incontinence with her bowel movements at least 3 times a day. She has to go to the bathroom 12 times a day and wakes up three times at night. She does not wear adult disposable underwear on a daily basis unless she is having a bad day. She wears the disposable underwear three times a week and she leaks even with the underwear. She carries an extra pair of clothes with her.

Claimant testified she told her doctors about her diarrhea. While[ ] there is mention of diarrhea in the record, the frequency and detailed description of the symptoms described by the claimant at the hearing are not found in the record. Indeed, records from internist Dr. Siddiqui from January 2015 through December 2015 document claimant was negative for diarrhea. Claimant reported having diarrhea for over 20 years and that her loss of bowel control has been present since 1990. Given that the claimant was able to work with this impairment prior to her alleged onset date with no indication that the frequency of her diarrhea has increased since the alleged onset date, suggests that it would not currently prevent work.

Claimant alleges disability due to her incontinence. While there are visits in which Dr. Siddiqui notes claimant's incontinence, at several visits he reports claimant does not have incontinence. The frequency of incontinence testified to by the claimant is not documented in the record. When seen on November 17, 2015, she told her doctor she has urinary frequency and urgency once a day. Interestingly, it was noted at this visit that the claimant was negative for diarrhea. I expressly reject the claimant's allegations regarding the frequency and severity of her gastrointestinal difficulties. If the claimant experienced diarrhea as severe as alleged, I would expect greater mention of such difficulties and more aggressive treatment in the medical records.

(R. 22 (citations omitted).) Regarding her need for a cane, the ALJ stated:

When claimant went to the consultative examiner on June 19, 2015, she was using a cane to aid her in her mobility. Claimant went to the doctor in July 2015 complaining of edema in both of her lower extremities. However, examination revealed no edema in her legs. Claimant's gait was unclear because the doctor stated that the claimant was using a cane and her gait was slow and cautious but also stated claimant's gait was normal. In any event, her use of the cane was not consistent. Records from Dr. Siddiqui from January-December 2015, document claimant having normal motor and sensory examinations with no weakness in arm and leg and normal gait. When seen on November 17, 2015, it was noted claimant was negative for back pain and gait problem.

(R. 23 (citations omitted).)

Van Buskirk argues that the ALJ's RFC determination was contrary to the evidence because he "failed to account for" her "need to take numerous bathroom breaks for her diarrhea

31

and fecal incontinence" as well as her "need for a cane." (Pl.'s Mem. at 16-18.) The Commissioner argues that the ALJ sufficiently accounted for these issues—to the extent they are "borne out by the record"—in arriving at his RFC determination. (Def.'s Mem. at 4.)

### 1. Additional Bathroom Breaks

The existence of Van Buskirk's diarrhea and incontinence is not at issue. Rather, the parties disagree about the frequency and severity of those conditions. Of primary importance is Van Buskirk's assertion that "[t]ests show [that] she has very little control and a low holding capacity." (Pl.'s Mem. at 18.) Her citations for that statement are, first, to her own testimony at the May 31, 2017 hearing (R. 58), and second, to her December 2014 visit with Dr. Anders Mellgren. (R. 548-49.)

With respect to the visit with Dr. Mellgren, his notes state that he evaluated her sphincter and pelvic floor and found a "small defect" in the internal muscle and "no significant injuries in the external muscle." (R. 548.) He further found that the "resting pressure was normal" but that "[s]queeze . . . is possibly slightly weaker than normal." (*Id.*) Moreover, this visit occurred in late 2014—prior to the alleged onset date, while Van Buskirk was still working, and prior to her rectal prolapse surgery in February 2015.

As for Van Buskirk's testimony, while she did claim to "go anywhere from five to ten times a day" (R. 58), and she stated that her "holding capacity is very, very low" (*id.*), the ALJ may reasonably find that "discrepancies between the objective evidence and self-reports . . . suggest symptom exaggeration." *Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010). Those discrepancies include the many instances in the record that medical staff found her negative for diarrhea or incontinence. (*See* R. 22.) In addition, as Van Buskirk implicitly acknowledged by citing to the 2014 visit with Dr. Mellgren, the record does not clearly support her contention that her incontinence worsened after the onset date. That discrepancy offers another justification for the ALJ to find that Van Buskirk's present need for bathroom breaks is not so significant that she cannot engage in certain light work.

32

Van Buskirk also argues that the ALJ "cannot simply disregard the medical conclusions of a qualified physician."  (Pl.'s Mem. at 17 (quoting *Pancake v. Amax Coal Co.*, 858 F.2d 1250, 1255 (7th Cir. 1988)).)  But it is not clear which physician's conclusions she believes the ALJ is disregarding.  As discussed, Dr. Mellgren's examination does not clearly support Van Buskirk's argument.  The medical opinions of Van Buskirk's treating physicians do not offer clear support, either; Dr. Noghnogh and Dr. Siddiqui both circled "bladder or bowel control" as one of the "limitations that would affect your patient's ability to work at a regular job on a competitive and sustained basis in an 8-hour work day environment."  (R. 710, 1114.)  But the doctors did not specify the extent of her limitations or the frequency of her bowel control issues, and they did not suggest that her limitation would necessarily prevent her from doing the types of light work assessed by the ALJ.

As discussed above, the court remands this case with instruction to the ALJ to provide a more detailed review of the medical opinion evidence.  The topic of bathroom breaks, in contrast to the medical opinions, was more thoroughly examined by the ALJ.  Still, on remand, the ALJ should consider the evidence in the record that does lend some support to Van Buskirk's claim of frequent incontinence, including the support found in the medical opinions of her treating physicians and the effect that mobility challenges would have on Van Buskirk's frequent need to use the bathroom.

### 2. Need for a Cane

Van Buskirk argues the ALJ failed to account for her need for a cane in determining her RFC.  She claims Dr. Siddiqui provided her with a prescription for a cane to help her ambulate. (Pl.'s Mem. at 18.)  She argues that "a light RFC requires standing or walking, on an on and off basis, for six to eight hours a day," and thus "it is unclear how someone prescribed a cane for walking would not require the apparatus for that length of time."  (*Id.*)  But there is no indication from the record that Dr. Siddiqui prescribed a cane.  Van Buskirk's citation for that claim is not to one of Dr. Siddiqui's treatment notes, but rather to a summary of her medical records written by

her attorneys. (*See* R. 383, 387.) The court finds no reference to a cane prescription in Dr. Siddiqui's notes (*see* R. 718-31, 793-99), and Van Buskirk herself appears now to acknowledge no such prescription appears in the record. (Pl.'s Reply at 1.)

Van Buskirk correctly argues that her need for a cane may nevertheless still be relevant to her RFC, even absent a prescription. (*Id.* at 1 (citing *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010)).) But any potential error in this instance is harmless. In his ruling, the ALJ noted the independent vocational expert's testimony that "even if the claimant needed to use a cane for prolonged walking . . . the individual could perform" the relevant jobs. (R. 28.) The vocational expert's testimony makes inapplicable Van Buskirk's citation to *Thomas v. Colvin*, 534 F. App'x 546 (7th Cir. 2013). In *Thomas*, the court found it was a critical error for the ALJ to fail to address whether the claimant needed a cane because the vocational expert had determined the claimant "must be disabled . . . if she requires the use of a cane." *Thomas*, 534 F. App'x at 547. That conclusion does not apply to Van Buskirk. Plus, the ALJ in *Thomas* failed to address the cane issue, whereas the ALJ in this instance considered the record and addressed it in his ruling, concluding that "the use of her cane is not consistent." (R. 23.) In sum, Van Buskirk's need for a cane would not alter the ALJ's conclusion that she can perform certain light work.

### C. Subjective Symptom Testimony

The ALJ found that "the claimant's statements concerning the intensity, persistence and limiting effects of [her alleged] symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. 21.) Van Buskirk argues that the ALJ "ignored the objective medical evidence supporting Plaintiff's complaints of serious symptoms and has failed to properly evaluate the intensity, persistence and limiting effects of her symptoms through the factors found in 20 C.F.R. § 404.1529(c)(3)." (Pl.'s Mem. at 19.)

The Commissioner does not address this argument—with one exception. In the subjective symptom section of her reply, Van Buskirk takes particular issue with the ALJ's finding that "[g]iven

the lack of evidence of ongoing edema, [the ALJ] expressly reject[ed] the claim that [Van Buskirk] needed to elevate her legs while seated."  (Pl.'s Reply at 8; R. 24.)  Van Buskirk points out that the record contains a note indicating edema and a recommendation for her to elevate her legs. (Pl.'s Reply at 8; R. 587.)  This prompted the Commissioner to file a sur-reply and argue that—as the ALJ noted in his ruling—Van Buskirk's own treating physicians stated she does not need to elevate her legs when sitting.  (Def.'s Sur-Reply [40] at 1; R. 24, 710, 1114.)  Those statements, by Dr. Siddiqui and Dr. Noghnogh, may cast some doubt on Van Buskirk's testimony that "to alleviate [her] pain she elevates her legs."  (R. 24.)

In the court's view, the ALJ's selective citation to a particular line in the medical opinions of Dr. Siddiqui and Dr. Noghnogh—which the ALJ subsequently gave "no weight" and "little weight," respectively (R. 25)—illustrates the incongruence of his reasoning.  Those opinions also offer significant support for Van Buskirk's subjective symptoms.  For example, Dr. Siddiqui noted Van Buskirk had "persistent back pain," that she could not walk a city block "without rest or severe pain," and that she needed to "lie down and/or recline during the day" for "[a]bout 4 hours" in an eight-hour workday because of fatigue and pain.  (R. 708-09.)  As discussed above, the ALJ does not adequately justify his decision to discount these opinions or the evidence in the record that supports these opinions.  And the regulations make clear that these opinions must be considered in evaluating symptoms such as pain.  *See* 20 C.F.R. § 404.1529(c)(3) ("We will consider all of the evidence presented, including . . . evidence submitted by your medical sources . . . . Section 404.1520c explains in detail how we consider medical opinions . . . about the nature and severity of your impairment(s) and any related symptoms, such as pain.").  As such, the court cannot agree with the Commissioner that substantial evidence supports the ALJ's finding that Van Buskirk's symptoms are inconsistent with the evidence in the record.

The ALJ's failure to consider the opinions of Van Buskirk's treating physicians (or otherwise justify his decision not to consider them) may by itself require a remand in this case. But the court also acknowledges Van Buskirk's many citations to medical tests, examinations,

diagnoses, and other notes in the record. (*See* [121] at 19-22.) The ALJ did not discuss much of this evidence or explain how it impacts his determination of either Van Buskirk's subjective symptoms or her RFC. And with the exception of the edema issue, the Commissioner does not address these citations at all. The ALJ cannot "cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). While the ALJ "need not mention every piece of evidence," he still must "build[ ] a logical bridge from the evidence to his conclusion." *Id.* Upon remand, the ALJ must ensure that this evidence is accounted for in his logical bridge.

## CONCLUSION

For the foregoing reasons, the ALJ's decision is reversed and remanded for further proceedings not inconsistent with this opinion, pursuant to Sentence Four of 42 U.S.C. § 405(g). Van Buskirk's Claim for Relief [1] is granted and the Commissioner's motion for summary judgment [20] is denied. Civil case terminated.

ENTER:

Dated: February 15, 2022

_____

REBECCA R. PALLMEYER
United States District Judge